UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JULIE COWERN, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | CIV.A. 14-10123-ADB |
| THE PRUDENTIAL INSURANCE | * | |
| COMPANY OF AMERICA and STAPLES | * | |
| VOLUNTARY LONG TERM | * | |
| DISABILITY PLAN, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

September 11, 2015

BURROUGHS, D.J.

I.      Introduction

        In this action brought under the Employee Retirement Income Security Act of 1974, 29

U.S.C. §§ 1001 et seq. ("ERISA"), Julie Cowern ("Ms. Cowern") challenges the decision of The

Prudential Insurance Company of America ("Prudential") to terminate her benefits under the

Staples Voluntary Long Term Disability Plan (the "LTD Plan"), administered and underwritten

by Prudential and sponsored by her former employer, Staples, Inc. ("Staples"). [Dkt. 1.] Ms.

Cowern seeks relief pursuant to 29 U.S.C. § 1132(a)(1)(B), which provides that "[a] civil action

may be brought . . . to recover benefits due . . . under the terms of [a] plan, to enforce [the] rights

under the terms of the plan, or to clarify [the] rights to future benefits under the terms of the plan

. . . ." [Dkt. 1.] The parties have cross-moved for summary judgment. [Dkt. 49 (Defendants'

Motion for Summary Judgment); Dkt. 51 (Plaintiff's Motion for Summary Judgment).]

        Ms. Cowern seeks the reinstatement of benefits under the LTD Plan; the retroactive

award of benefits, with interest, from the date of termination by Prudential until the present; and

the award of statutory penalties, attorney's fees and costs as provided by 29 U.S.C. § 1132(g). [Dkt. Nos. 1, 51, 52.] The defendants seek summary judgment on all claims raised in Ms. Cowern's complaint. [Dkt Nos. 49, 50.] For the reasons explained in this opinion, both motions for summary judgment are DENIED. The Court holds that Prudential's decision to terminate benefits was arbitrary and capricious, and the case is therefore REMANDED to Prudential for further proceedings consistent with this opinion.

## II.      Background[1]

From July 1998 to September 2009, Ms. Cowern was employed by Staples as a "Programmer/Analyst." [R. 111, 172.] She first experienced gastrointestinal ("GI") symptoms in the early 1990s. [R. 108, 172.] In the late 1990s, her GI symptoms increased in duration and severity, and she began experiencing acute attacks of symptoms. [Id.] Her symptoms have included, inter alia, diarrhea, bloody stools, vomiting, exhaustion, fevers, abdominal pain and swelling, joint pain and swelling, nausea, and skin lesions. [R. 172-73.] Due to her worsening symptoms, Ms. Cowern was "in and out of work" for increasing periods of time. [R. 108, 115, 172-73.] By 2008, she was "out of work for months at time . . . ." [R. 108, 173.]

On April 24, 2009, Ms. Cowern stopped working due to her symptoms. [R. 2044, 2134.] On September 1, 2009, she attempted to return to work. However, she left work again two weeks later, on September 16, 2009, on the recommendation of her primary care physician, Dr. Joseph Harrington ("Dr. Harrington"), who instructed her to remain out of work indefinitely. [R. 2134-35.] She has not worked since then.

---

[1] The administrative record consists of 2294 pages, which are numbered from PRU-77212-000413-000001 to PRU-77212-000413-002294. References to pages in the record are cited in this opinion as "R. __," where the page number is shortened to the final portion of the identification number. Thus, for example, PRU-77212-000413-000001 is cited as R. 1.

### A.      The LTD Plan

Ms. Cowern's LTD benefits are governed by the terms of the LTD Plan. [R. 1-53.] The

LTD benefits are fully insured by Prudential, and therefore, any such benefits are payable by

Prudential. [Dkt. 50 at 3.] The LTD Plan is sponsored by Staples, Ms. Cowern's former

employer, and consists of a Group Contract, Certificate of Insurance, and Summary Plan

Description. [R. 1-53; see also Dkt. 50 at 2-3.]

The LTD Plan names Prudential as the Claims Administrator and provides that "[t]he

Prudential Insurance Company of America as Claims Administrator has the sole discretion to

interpret the terms of the Group Contract, to make factual findings, and to determine eligibility

for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary

and capricious." [R. 38.]

To be eligible for benefits under the LTD Plan, a claimant must be determined to be

disabled within the meaning of the LTD Plan. The plan defines disability as follows:

**How Does Prudential Define Disability?**

You are disabled when Prudential determines that:

- you are unable to perform the ***material and substantial duties*** of your ***regular occupation*** due to your ***sickness*** or ***injury***; and

- you have a 20% or more loss in your ***indexed monthly earnings*** due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any ***gainful occupation*** for which you are reasonably fitted by education, training or experience.

[R. 14 (emphasis in original).][2]

---

[2] The bolded and italicized words that appear in this definition are defined terms in the LTD Plan [R. 14-15], though the definitions are not material to the cross-motions for summary judgment.

Even if a claimant is found to be disabled as defined in the LTD Plan, certain disabilities have a lifetime limitation of 24 months (meaning that the benefits terminate after a total of 24 months, whether consecutive or not). This limitation applies to "[d]isabilities due to a sickness or injury which, as determined by Prudential, are primarily based on *self-reported symptoms*" (the "SRS limitation"). [R. 22 (emphasis in original).][3] The LTD Plan defines "self-reported symptoms" as follows:

> *Self-reported symptoms* means the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

[R. 23.]

Prudential provides internal guidelines to the "LTD Teams" that evaluate claims for LTD benefits. [R. 2292.] This includes the following guidance on the SRS limitation:

> When evaluating a claim where the SRS limitation applies, you need to consider *manifestations* of the condition. Consider whether the manifestations are based in the claimant's subjective reports or the product of objective findings. Consider whether the manifestation (i.e. feelings of pain, fatigue, dizziness, cognitive loss) can be linked to an objective finding (such as an MRI, x-ray, neuropsychological testing, et al.) If such a link cannot be made, application of the SRS limit may be appropriate. When evaluating such a situation, it is suggested that you consult with a clinical resource. An important distinction to be made when considering application of the SRS limit is that the *manifestations* of a condition should be the focus, rather than the *diagnosis*. Several diagnoses can be determined without the manifestations being verifiable.

[R. 2293 (emphasis in original).][4]

---

[3] The 24-month limitation also applies to disabilities based on mental illness. [R. 22.]

[4] In addition, the following language appears at the end of the internal guidelines:

> Our overriding goal is to apply the terms of the Group Policy to the facts developed in a full and fair review of the claim, and reach the correct conclusion as to whether the claim qualifies for benefits. These are internal guidelines of the Company to assist you in reaching this goal efficiently and accurately. These are not hard and fast rules. You may

Prudential asserts that it was justified in applying the SRS limitation to terminate Ms. Cowern's benefits and in denying her subsequent appeals, because her condition is primarily based on self-reported symptoms and is not supported by objective medical evidence. [E.g., R. 2236-38, 2252-56.] Ms. Cowern disputes Prudential's decision to apply the SRS limitation to her situation and further argues that Prudential's review of her claim was improperly selective in various ways that are discussed below.

**B.    Procedural History**

Ms. Cowern applied for short-term disability ("STD") benefits under the Group Plan, claiming disability due to inflammatory bowel disorder with abdominal pain beginning on April 25, 2009. [R. 2044, 2129-31, 2221.] On June 1, 2009, Prudential approved STD benefits effective May 2, 2009 through June 7, 2009. [R. 2195.] Prudential subsequently extended STD benefits through August 31, 2009. [R. 2221.]

Ms. Cowern then applied for LTD benefits, which Prudential initially approved on October 7, 2009, effective October 29, 2009. [R. 2222.] The initial approval was based on a review of Ms. Cowern's medical records by Dr. David Dickison ("Dr. Dickison"), an occupational medicine doctor retained by Prudential. [R. 2131-46.]

After the initial approval, Prudential requested an internal medical review, which was conducted by Dr. Richard Day ("Dr. Day"), a Prudential employee. In a report dated February 17, 2010, Dr. Day concluded that Ms. Cowern was out of work due to self-reported symptoms and not due to an objectively verifiable medical reason. [R. 2121-26.]

---

deviate from strict adherence to the guidelines if, in your discretion, doing so is necessary to reach the correct result based on the facts and the terms of the Group Policy. [R. 2294.]

In January and March 2010, at Prudential's request, covert video surveillance was conducted of Ms. Cowern. This surveillance is discussed below.

Throughout 2010, Prudential continued to review Ms. Cowern's medical records, including updates thereto. In a letter dated September 20, 2010, Prudential, quoting the LTD Plan's definition of disability and the 24-month limitation for certain disabilities, informed Ms. Cowern that unless she provided additional evidence to support her claim, the "initial 24 month period of disability" would end and her LTD benefits would terminate on October 29, 2011. [R. 2229-31.]

In a letter dated September 15, 2011, Prudential again informed Ms. Cowern that her LTD benefits would terminate on October 29, 2011, citing the SRS limitation. [R. 2236-38.] The letter also informed Ms. Cowern of the reasons for Prudential's decision to apply the SRS limitation, and reiterated that because she had not provided additional evidence to support her claim of continued disability, no further benefits were payable. [Id.]

On September 20, 2011, Ms. Cowern appealed Prudential's decision to terminate her LTD benefits. [R. 1802-03.] The parties exchanged several letters, and Ms. Cowern submitted additional medical information for consideration in the appeal, which Prudential acknowledged receiving in a letter dated April 26, 2012. [R. 2246.] Prudential then submitted her medical records to a multidisciplinary review panel consisting of Dr. Elena Antonelli ("Dr. Antonelli"), an occupational medicine physician, and Dr. Raj Vuppalanchi ("Dr. Vuppalanchi"), a gastroenterologist. [R. 794-827, 2252-56.]

On August 15, 2012, Prudential denied Ms. Cowern's first appeal, citing a lack of objective support for her symptoms. [R. 2252-56.] Prudential concluded that her condition was based on self-reported symptoms, and thus, that the SRS limitation applied. [R. 2255.]

On February 7, 2013, Ms. Cowern filed a second appeal with Prudential. Prudential sent her medical records to a second multidisciplinary review panel consisting of Dr. Antonelli and Dr. Thomas Liebermann ("Dr. Liebermann"), a gastroenterologist. Prudential also asked Dr. Rajesh Wadhwa ("Dr. Wadhwa"), an occupational medicine physician, to conduct an additional review of the medical records, and to review the assessments of the two multidisciplinary panels. Further, Prudential requested a vocational report, which was prepared by Frances Grunden, MS, CRC.[5] [R. 377-386.]

On August 29, 2013, Prudential denied Ms. Cowern's second appeal, finding that the medical records did not contain objective evidence of pain, but reflected only self-reported pain, and that there was no objective evidence of work-related restrictions or limitations. [R. 2264-69.] Prudential concluded that the medical and vocational records provided by Ms. Cowern indicated that she could perform "the material and substantial duties of her sedentary occupation as a Principal Programmer Analyst." [R. 2269.] Prudential further determined that the records "lack consistent documentation of impairment," and that her purported "inability to work in any occupation is based on Ms. Cowern's self-reports." [Id.]

On January 17, 2014, Ms. Cowern filed a complaint in this Court. [Dkt. 1.] The case was originally assigned to Judge Richard G. Stearns. On August 11, 2014, Ms. Cowern filed a "Motion for Limited Pre-Trial Discovery and to Expand the Scope of the Judicial Record." [Dkt. 27.] She sought discovery of, among other things, information concerning Prudential's

---

[5] Certified Rehabilitation Counselor.

conflict of interest, which she alleged went "far beyond the structural conflict of interest inherent in Prudential's role as both the administrator of Ms. Cowern's claim and the payer of her benefits." [Dkt. 27 at 2.] The defendants opposed this request [Dkt. 31], and on October 16, 2014, Judge Stearns denied it on the ground that Ms. Cowern had "not identified any specific irregularities, unfairness or actual bias in the determination of her claims that would warrant the broad discovery she seeks . . . ." [Dkt. 34.]

On February 10, 2015, the parties cross-moved for summary judgment. [Dkt. Nos. 49-52.] The parties filed oppositions on March 12, 2015 [Dkt. Nos. 54-55] and reply briefs on March 31, 2015 [Dkt. Nos. 58-59]. On March 24, 2015, this action was randomly reassigned to the undersigned. The Court has carefully considered all of the parties' briefs and the administrative record in rendering this decision.

### C.     Ms. Cowern's Medical Records

Since the onset of her abdominal condition in the 1990s, Ms. Cowern has been treated by at least ten of her own medical professionals, including several gastroenterologists and rheumatologists. She also engaged the services of an occupational therapist and a vocational consultant in connection with her claim for disability benefits. She has sought treatment at the emergency room on multiple occasions. [E.g., R. 924-940.] In July 2011, she had exploratory laparoscopic surgery in an attempt to diagnose her condition.[6]

Prudential also retained professionals to review Ms. Cowern's medical records and opine on her condition. These professionals included six physicians with board certifications, including

---

[6] The surgeon, Dr. Robert Canning, found no significant adhesions of the bowel, no pelvic adhesions, normal appearing organs, and no evidence of Crohn's disease. [R. 1334-46, 2237.]

in occupational medicine and gastroenterology, two registered nurses, and one vocational consultant. None of the Prudential-retained professionals physically examined Ms. Cowern.

The record reflects that no one, including Ms. Cowern's treating doctors, has been able to diagnose her condition definitively. However, at least three doctors—Dr. Norton Greenberger (Ms. Cowern's treating gastroenterologist), Dr. Antonelli (an occupational medicine physician retained by Prudential), and Dr. Liebermann (a gastroenterologist retained by Prudential)—opined that Ms. Cowern might be suffering from "narcotic bowel syndrome" due to her long-term use of morphine. Relatedly, Prudential's Medical Director, Dr. Wadhwa (an occupational medicine physician) opined that Ms. Cowern's narcotic use "introduces a confounding factor in the clinical picture." [R. 2066.]

In December 2009, Prudential engaged FactualPhoto, a surveillance services firm, to conduct covert video surveillance of Ms. Cowern. FactualPhoto conducted the surveillance on January 6, 7, 8, and 9, 2010. [R. 67, 1898-1905; see also Dkt. 52 at 13.] In March 2010, Prudential directed FactualPhoto to conduct further surveillance, which occurred on March 11, 12, 13, 14 and 15, 2010. [R. 67, 1887-97; see also Dkt. 52 at 13.] The surveillance footage was reviewed by many of the medical professionals retained by Prudential, including Drs. Antonelli, Vuppalanchi, Day and Liebermann. The reviewing doctors assigned differing weights to the surveillance footage, and came to differing conclusions. For example, Dr. Antonelli found that the surveillance confirmed Ms. Cowern's ability to work in a sedentary occupation; Dr. Liebermann, conversely, found that the footage provided "no significant information."[7]

---

[7] James Parker, Ms. Cowern's vocational consultant, also addressed the surveillance footage in his report. Like Dr. Liebermann, he concluded that the footage was irrelevant to assessing Ms. Cowern's claim for LTD benefits.

The parties agree that Ms. Cowern's occupation of programmer/analyst is sedentary, and that any gainful occupation for which she is reasonably suited is sedentary. However, as detailed below, professional opinions as to whether she is able to perform the duties of a sedentary occupation have varied drastically. The medical and vocational professionals who have expressed an opinion on this issue have been largely (but not entirely) divided along the lines of which party retained them. One notable exception is gastroenterologist Dr. Liebermann, retained by Prudential, who stated: "I personally doubt the claimant can return to work on a fulltime basis due to the intensity of her symptoms and also the use of substantial amount of narcotics that she is by now habituated to." [R. 384.]

The administrative record exceeds two thousand pages. The record contains numerous conflicting interpretations, opinions and conclusions. The following is a summary of those opinions that are most salient to the parties' cross-motions for summary judgment.

*Ms. Cowern's Medical and Vocational Professionals*

### 1.      Dr. Joseph Harrington (Ms. Cowern's Primary Care Physician)

Dr. Harrington has been Ms. Cowern's primary care physician since 2002. [R. 1860.] In notes dated November 17, 2009, Dr. Harrington wrote:

> Julie is now on long-term disability from work due to her chronic abdominal pain and frequent exacerbations of diarrhea and lethargy. Despite continued aggressive evaluation a diagnosis remains elusive. . . . [T]his weekend she had numerous loose watery bowel movements, but became bloody over time. . . . To date, labs done during episodes have been unrevealing. . . . Severe abdominal pain . . . occurs intermittently, but increasingly frequent and severe. . . . She remains disabled and not able to work due to these frequent episodes that made it impossible for her to maintain a position at Staples.

[R. 1081.]

In a letter dated September 16, 2010, Dr. Harrington stated that "[m]ost of the doctors involved in her care believe her to have some variant of inflammatory bowel disease. At times

we have had objective evidence with CT scans showing colonic inflammation, colonoscopy revealing hemorrhagic colitis, and biopsies consistent with that diagnosis." [R. 1860.]

In a letter dated April 4, 2012, Dr. Harrington provided an update regarding Ms. Cowern's condition. He noted that during "periods of exacerbation," she experienced "frequent diarrhea, often bloody, fever, tremendous fatigue, and loss of appetite." [R. 982.] He stated that "[o]bjectively during these episodes we have documented elevation in white blood cell counts on frequent occasions . . . . Other objective findings include a CT of abdomen and pelvis in April 2009 [which] showed diffuse thickening of right colon and segmental colitis." [Id.] Another CT performed in February 2006 showed "active inflammation in sigmoid colon compatible with active inflammation." [Id.] He concluded that "[c]ertainly I cannot see her returning to her previous occupation that she held at Staples or to any position with a similar job description, unless she has some future, and at this time unforeseen, improvement in her condition." [R. 983.]

## 2.    Dr. Steven Fine (Ms. Cowern's Gastroenterologist)

Dr. Fine is Ms. Cowern's treating gastroenterologist. In a letter dated June 1, 2012, Dr. Fine stated:

> Although there is no clear diagnosis, it is clear that her problem is multi-system in nature and involve[s] inflammatory processes. We have approached her [case] as some variant of inflammatory bowel disease, as her inflammatory processes have affected the bowel, joints, and the skin. Therefore, I would call her diagnosis a multi-system inflammatory disease.

[R. 769; see also Dkt. 52 at 7.]

In the same letter, Dr. Fine responded to Prudential's "comments regarding her inappropriateness for disability because her disease process does not give objective findings." [R. 769.] He opined:

[T]his statement is incorrect. Throughout her evaluation, and what is clear in her records is evidence of leukocytosis,[8] bowel inflammation seen on biopsy as well as CT scan, and I have spoken directly with her rheumatologist who has found inflammatory changes on the exam of her joints. She has also had skin lesions. Her disease has both acute and chronic components.

[Id.]

Dr. Fine further commented in this letter, "I have read concerns that her symptoms are self-reported and therefore cannot be validated. However, . . . symptoms by their very nature are self-reported. It is inappropriate to ignore a patient's symptoms when there are indeed objective findings as noted above." [Id.]

### 3.    Dr. Norton Greenberger (Ms. Cowern's Gastroenterologist)

Another treating gastroenterologist, Dr. Greenberger, stated in a letter dated May 3, 2011:

I think, with her longstanding morphine use, that she does have a narcotic bowel syndrome, and such patients can have alternating diarrhea and constipation, and worsening abdominal pain, with a "crash" and "soar" phenomenon . . . . She also has features of irritable bowel syndrome. Some of this may be diet related . . . . I think the very detailed and extensive studies done by Dr. Fine and Dr. Harrington have ruled out unusual causes of abdominal pain, . . . and there is no evidence that she has inflammatory bowel disease. Furthermore, all of her inflammatory bowel markers are negative.

[R. 1041.] He further stated that Ms. Cowern "may have a mast cell activation syndrome." [Id.]

### 4.    Dr. Eileen Winston (Ms. Cowern's Rheumatologist)

Dr. Winston was Ms. Cowern's rheumatologist between at least 2009 and 2011. [R. 1668-1671, 1973-79.] In a letter dated October 1, 2009, Dr. Winston stated that Ms. Cowern

says that for at least 10 years she has had recurrent attacks. They begin with generalized malaise, abdominal pain with nausea, she develops diarrhea, skin lesions that by biopsy have been said to be most consistent with erythema nodosum[9] and she develop[s] a low-grade fever of 100-101 frequently associated with shaking chills. She has eczema that also seems to flare with these attacks.

---

[8] Elevated white blood cell count.

[9] A skin inflammation characterized by reddish, painful, tender lumps.

> She says abdominal pain is really severe. It comes on within an hour and last[s] 3-4 weeks at the minimum and months at the maximum.

[R. 1974.] Dr. Winston further stated that Ms. Cowern suffered from

> [a]cute episodes of abdominal pain with fever, leukocytosis, shaking chills by description, skin lesions reportedly consistent with erythema nodosum, etc. etc.

> Most likely diagnosis is indeed Crohn's. Ulcerative colitis should be considered.

> . . . .

> I would comment that I do not find or sense any significant mental health issues at play here.

[R. 1978.]

In a report dated August 9, 2011, Dr. Winston noted her impression that Ms. Cowern was suffering from "[p]eriodic febrile syndrome with skin lesions and abdominal pain . . . ." [R. 1668.] She noted that "Julie continues to complain of worsening stomach upset, much worse diarrhea, and ongoing fevers that she rates as stable." [R. 1669.]

### 5.  Dr. Bonnie Bermas (Ms. Cowern's Rheumatologist)

Rheumatologist Dr. Bermas examined Ms. Cowern on May 12, 2009. In a letter dated May 21, 2009, Dr. Bermas stated:

> This is a 47-year-old woman who was referred to me for possible systemic rheumatic disease. . . .

> [O]ver the past 2 years, she has developed the symptoms of having intermittent severe abdominal pain that requires her to go to the emergency room for pain relief. She has diarrhea, nausea, vomiting. Also, intermittent to that is constipation. She will occasionally get fevers with this.

> . . . .

> I cannot find a rheumatologic disorder which would explain this constellation of symptoms. . . . This could be inflammatory bowel disease with some joint achiness,

although, usually, if they have arthritis and inflammatory bowel disease, it is more of a synovitis.[10]

### 6.    Dr. Jonathan Coblyn (Ms. Cowern's Rheumatologist)

Another rheumatologist, Dr. Coblyn, examined Ms. Cowern on March 14, 2012. [R. 455-56.] He found Ms. Cowern's abdomen to be "a bit protuberant and somewhat diffusely tender with normal bowel sounds." [R. 455.] He also noted "swelling in her right knee with pain" and "some limited motion of the cervical spine, but . . . no other synovitis of the upper or lower extremities including her cervical and lumbar spine." [Id.] He concluded that "[a]t this point, she has an undiagnosed febrile syndrome with abdominal pain as [well as] rash and arthritis. She may or may not have inflammatory bowel disease, as I cannot tell reading the record." [Id.]

Dr. Coblyn examined Ms. Cowern again on December 19, 2012. [R. 442.] He noted that the "[j]oint exam was remarkable for subtle swelling over MCP[11] and wrist on the left, but not nearly to the extent that she had said, some limited motion of cervical spine, some discomfort over her right MCPs and a trace small effusion in her right knee[12] greater than her left." [Id.]

### 7.    Gail Breeze, OT (Ms. Cowern's Occupational Therapist)

On April 1, 2013, occupational therapist Gail Breeze evaluated Ms. Cowern for two hours and completed a Functional Capacity Evaluation. [R. 154-57.] Ms. Breeze opined:

> [I]t appears Ms. Julie Cowern does not demonstrate functional capacities adequate to perform full-duty as a principal program analyst at this time. Currently performing in at a below sedentary level of physical activity with regard to load handling. . . . Appeared to give full effort during the evaluation and is demonstrated by consistency of effort testing.

---

[10] A painful inflammation of the synovial membrane, which lines joints that possess cavities.

[11] Knuckle.

[12] Swelling of the knee caused by excess fluid.

[R. 157.] Ms. Breeze also noted that Ms. Cowern "was 1/2 hour late for her evaluation today due to having to stop to go to the bathroom 2 times while on the way. The patient went to the bathroom 3 times during the evaluation." [Id.]

### 8.      James Parker, CVRP,[13] CRC (Ms. Cowern's Vocational Consultant)

James Parker, a vocational consultant, performed two vocational assessments of Ms. Cowern, dated July 30, 2012, and August 9, 2013. [R. 108-18, 714-26.] These assessments were based on a review of Ms. Cowern's medical records.

In his first assessment of July 30, 2012, Mr. Parker evaluated Ms. Cowern's ability to perform the duties of her occupation of "programmer/analyst." [R. 718.] Mr. Parker noted that the exertional demands required in this occupation are sedentary. [R. 719.] He concluded that "more likely than not within a reasonable degree of vocational rehabilitation certainty Ms. Cowern is totally disabled from all work for which she could reasonably qualify by education, training, and experience and will remain so for the foreseeable future." [R. 723]

Mr. Parker also addressed the video surveillance report that had been conducted at Prudential's request. [R. 720.] He stated:

> It is this consultant's vocational opinion that the surveillance report documents inactivity, not activity that would be predictive of any ability to sustain work. . . . It is impossible to assess through video surveillance the significance of the above symptoms that have periods of exacerbation as well as short term ability to function. Ms. Cowern's observed activities are not inconsistent with the medical record. The use of surveillance video with a symptom cluster documented throughout the record is nonsensical and has no validity in predicting anything.

[Id.]

In his second assessment of August 9, 2013, Mr. Parker evaluated whether Ms. Cowern could perform the duties of her occupation or of any gainful occupation. [R. 114.] He opined that

---

[13] Certified Vocational Rehabilitation Professional.

"[b]ased on the limitations established in the objective record, Ms. Cowern is unable to perform the . . . essential duties most of which would be required in sustaining professional employment of any kind." [Id.]

Mr. Parker further noted that "[s]ubsequent to this consultant's first vocational report, Ms. Cowern was found to be totally disabled by the Social Security Administration (SSA). . . . Records indicate in an SSA decision, Ms. Cowern was awarded benefits beginning in August of 2010." [R. 115; see also R. 108-09.]

Additionally, Mr. Parker reviewed the Functional Capacity Evaluation ("FCE") conducted by Ms. Breeze. [R. 115.] He concluded that "[t]he deficits and impairments documented in the FCE totally disable Ms. Cowern from sustaining and performing not only as a Programmer Analyst but also in any occupation for which she would qualify by reason of education, training, and experience." [Id.]

*Prudential's Medical and Vocational Professionals*

### 1.    Dr. David Dickison

Dr. Dickison is a board-certified physician in occupational medicine. [R. 2133, 2141.] In notes dated August 14, 2009, based on a "brief[] review[]" of Ms. Cowern's medical records, he found that "[a]lthough the clmt has a history of inflammatory bowel disease with periodic flare, records suggest these have been relatively short-lived and it is unclear why this one has continued since April 2009." [R. 2110-41.] He stated that "[t]here are no recent medical records for review, therefore no basis for medical assessment of ongoing impairment as of 6/28/09 and beyond." [Id.]

In notes dated September 28, 2009, Dr. Dickison stated that he had now spoken with Dr. Harrington (Ms. Cowern's primary care physician) and reviewed additional records from Dr.

Harrington. [R. 2131-33.] Based on this additional information, Dr. Dickison opined that Ms.

Cowern

> does not have sustained capacity; [Dr. Harrington] feels she has a real condition but
> elusive diagnosis.
>
> Although much of [Ms. Cowern's] incapacity is based on self-reported symptoms
> considering [Dr. Harrington's] input, prior support for impairment, pending
> additional work-up and lack of significant contradictory information, current
> impairment precluding ability to sustain work even at PT sedentary seems
> supported.

[R. 2133.]

Based on Dr. Dickison's review, Prudential initially approved LTD benefits in October

2009. [R. 2222.]

### 2.      Dr. Richard Day

Dr. Day, a Prudential Vice-President and Medical Director [Dkt. 50 at 6; Dkt. 52 at 14],

conducted two reviews of Ms. Cowern's medical records. [R. 2121-26, 2110-11.] In a report of

his first review, dated February 17, 2010, Dr. Day stated that "[t]he claimant has a chronic

abdominal pain condition that has not been identified with multiple specialist evaluations over

the past 10 years. The pain condition is self reported without objective findings." [R. 2125.] He

opined:

> Given the absence of a medical explanation for the claimant's pain complaint a
> behavioral condition may be at play at least in part contributing to the claimant's
> self report[ed] limitations. The claimant is out of work because of the self reported
> pain limited [sic], not due to a medical reason to restrict work activities.

[R. 2126.] He further noted that "[t]here is no other evidence of a rheumatological or

neurological disorder that is resulting in limitation of functional capacity or a medical reason to

restrict work activities." [Id.] He opined that "[p]rognosis for improvement is guarded given the

duration of the symptoms, the self reported nature of the limitation and lack of medical support

to objectively diagnose a condition [which] suggests that at least in part there is a behavioral contribution." [Id.] He recommended that Prudential should "[c]onsider senior claim review." [Id.]

For his second assessment of September 14, 2010, Dr. Day reviewed updated medical records submitted by Ms. Cowern, as well as the surveillance footage. He noted that "[t]he video surveillance documented the claimant driving and ambulating without difficulty." [R. 2110.] He opined more generally that "[t]his is a complicated medical history without a unifying diagnosis and evaluations with GI specialists and Rheumatology have not provided insight to the medical condition except that the evaluations are unremarkable." [R. 2111.][14]

Based on Dr. Day's reviews, on September 20, 2010, Prudential notified Ms. Cowern that her LTD benefits would expire after 24 months, on October 29, 2011. [R. 2229-31.]

### 3.      Dr. Elena Antonelli

Dr. Antonelli is a board-certified physician in occupational medicine [R. 815], retained by Prudential to review Ms. Cowern's medical records in both the first and second internal appeals. In a 22-page report dated June 21, 2012, based on her initial review as part of a multidisciplinary panel with gastroenterologist Dr. Vuppalanchi [R. 794-815], Dr. Antonelli provided: a detailed summary of Ms. Cowern's medical records [R. 795-809]; a summary of the surveillance footage [R. 809-10]; and a discussion of her conclusions reached with Dr. Vuppalanchi [R. 810-11]. In this report, she stated that she and Dr. Vuppalanchi "primarily discussed the fact that the claimant has had a very complicated medical history but little in the way of objective findings to support ongoing impairment . . . ." [R. 810.] She further stated that

---

[14] On November 19, 2010, Dr. Day stated: "I have reviewed the letter from Dr. Harrington from 9/16/2010. This information does not change my previous assessment." [R. 2102.]

"[t]here is documentation that the claimant has had multiple complaints relative primary [sic] to her abdominal pain, and she has multiple other symptoms but few, if any objective findings, to support a specific syndrome or other condition that would explain her symptoms." [Id.] Dr. Antonelli also noted that the surveillance footage "revealed that [Ms. Cowern] was highly functional. She was able to drive a car. She was able to walk. She was able to go into stores at least at Dunkin' Donuts." [Id.] She concluded:

> Dr. Vuppalanchi and I came to the agreement that the claimant was likely to be able to do light duty work on a regular basis. She may continue to have the symptoms that she reports, but there is no evidence that she is totally impaired from any and all productive work based on the information provided for review in the records and also the surveillance tape, which showed her again to be highly functional and capable of driving a car.

[R. 811.]

On July 23, 2012, Dr. Antonelli completed a follow-up review based on additional medical records that Ms. Cowern had submitted, including June 2012 office notes from Dr. Fine, Ms. Cowern's treating gastroenterologist. [R. 745-50.] In this report, Dr. Antonelli stated:

> The documentation provided does not alter my prior assessment. It is unclear how the objective findings that Dr. Fine described are sufficient to support that the claimant has significant impairment on a usual basis. She has been described as having, for the most part, unremarkable physical findings and intermittent symptoms. . . . She is not described as being significantly impaired other than as she describes relative to her symptoms.

[R. 749.]

When Ms. Cowern filed her second appeal, Prudential again engaged Dr. Antonelli to review her records as part of a multidisciplinary panel, this time with gastroenterologist Dr. Liebermann. On March 15, 2013, Dr. Antonelli completed a 26-page report summarizing the findings of this review. [R. 349-374.] She stated in the report:

> Dr. Liebermann and I agreed that the claimant's case is extremely complex and no clear diagnosis was made. There are concerns that the claimant underwent

extensive evaluation and treatment with major types of medications despite no clear diagnosis. No consideration was given to the fact that she was making multiple trips to the Emergency Department and would feel better with treatment with narcotics and then would be discharged in improved condition. There is no documentation of possible narcotic bowel syndrome which can cause abdominal pain, constipation, etc. In addition, there is no documentation that a psychological evaluation was ever done or even considered as would be appropriate in this type of case. We agreed that there is no reason during the period of time in question for the claimant to have been unable to work in a sedentary capacity.

[R. 369.] As to Ms. Cowern's prognosis, Dr. Antonelli opined that "[t]he restrictions are likely to be permanent since she has not shown improvement and no definitive diagnosis was made that would help guide further treatment." [R. 372.] She concluded:

I do not agree that the claimant has been unable to work full time with restricted activities during the period of time in question. Dr. Harrington has stated on multiple occasions that he believes she has these symptoms but no clear diagnosis could be made. However, she has had few physical findings to support total impairment from productive work.

[R. 373.][15]

Prudential denied Ms. Cowern's first and second internal appeals based in part on Dr. Antonelli's reports. [R. 2252-56; 2264-69.]

### 4.    Dr. Raj Vuppalanchi

Dr. Vuppalanchi is a board-certified physician in gastroenterology and internal medicine. [R. 827.] In a report dated June 21, 2012, summarizing his multidisciplinary panel review with Dr. Antonelli as part of the first internal appeal, he described his "clinical impression" as follows: "To date, I have not seen any diagnosis made based on imaging, laboratory, biopsy/histology for Crohn's Disease. Most of the symptoms are self-reported. . . . In summary, I do feel that the claimant's symptom severity is mostly self-reported . . . ." [R. 823.] He agreed

---

[15] Dr. Antonelli completed several addenda to her review based on additional records submitted, repeatedly concluding that any new information "does not materially change my original position" or "does not objectively change my original opinions about this claimant's impairments." [R. 227, 235.]

with Dr. Antonelli that "[t]here was no objective evidence that would limit the claimant or restrict pursuing a sedentary job. The claimant would likely be able to do light duty work on a regular basis." [Id.] He also noted that the surveillance footage "show[ed] Ms. Cowern walking to her car with hand bag and driving her car with no restrictions or limitations." [R. 824.] He concluded that "[o]verall, I do not feel that she has any restrictions and/or limitations based on her surveillance imaging videos." [Id.][16]

### 5.    Dr. Thomas Liebermann

Prudential engaged Dr. Liebermann, a board-certified physician in gastroenterology and internal medicine, to review Ms. Cowern's records as part of a second multidisciplinary panel (with Dr. Antonelli). On March 8, 2013, Dr. Liebermann completed a report summarizing his review. [R. 377-86.] In his report, he stated that he and Dr. Antonelli

> reached a consensus of medical opinion regarding the case of Ms. Julie Cowern. We both believe that the claimant has a definite functional disorder of the gastrointestinal tract compounded by the protracted use[] of narcotic analgesic medications resulting in the so-called narcotic bowel syndrome which explains the periodic exacerbations of her abdominal pain.

[R. 382.] He also noted Ms. Cowern's "numerous" emergency room visits, hospitalizations, and diagnostic evaluations, including a diagnostic laparoscopy in which "[t]he surgeon reported no abnormalities within the abdominal cavity with careful examination of the entire contents." [R. 381.] He stated:

> In all likelihood she has a pain predominant form of the irritable bowel syndrome and narcotic bowel syndrome. Her record is replete with information that would tend to favor this type of diagnosis. There are literally hundreds of pages of clinical information regarding the opinions of physicians, tests, operations, etc. which attest to the negative findings in the context of the claimant's symptomatology.

---

[16] On July 30, 2012, Dr. Vuppalanchi completed a follow-up review of additional records. [R. 753-55.] He concluded that the additional information "does not alter my prior assessment." [Id.]

[R. 383-84.]

Dr. Liebermann further opined that "a diagnosis of inflammatory bowel disease cannot be considered as likely." [R. 384.] In support of this opinion, he noted that Ms. Cowern "has had biopsies of the colon in areas where the radiologist has identified thickening of the wall without any pathology being encountered on the biopsy. The surgeon has had the claimant's bowel in his hand without the identification of any pathology." [Id.] He further noted that Ms. Cowern did not exhibit signs of Crohn's disease, and that after more than ten years of symptoms, "one would think that if inflammatory bowel disease would be present it should have been obvious by now." [Id.]

As to Ms. Cowern's physical limitations and her ability to return to work, Dr. Liebermann stated that "[t]here are no restrictions/limitations supported specifically directed towards the gastrointestinal portion of the claimant's symptoms from 10/30/11 forward." [R. 382.] He further explained:

> Although the claimant's gastrointestinal diagnosis is not fully established, it is in all likelihood pain predominant severe irritable bowel syndrome combined with narcotic bowel syndrome. For treatment of these conditions and as Dr. Greenberger suggested narcotics will have to be withdrawn. For the treatment of the aforementioned conditions there are no physical or dietary limitations. The claimant has no limitations or restrictions regarding her physical activity and can sit, stand, walk, reach, lift, carry, perform upper extremity activities, or other physical activities. There are no published data that support any limitations or restrictions whatsoever for those syndromes.

[R. 383.]

However, despite all of the above, Dr. Liebermann concluded by noting: "I personally doubt the claimant can return to work on a fulltime basis due to the intensity of her symptoms and also the use of substantial amount of narcotics that that she is by now habituated to." [R. 384.] He reiterated, though, that "[a]s noted above there are no restrictions/limitations that can or

should be imposed from a gastrointestinal standpoint." [Id.] He dismissed the usefulness of the surveillance footage, noting that "[n]o significant information was provided" other than "seeing the claimant get in and out of her automobile." [R. 382.]

Dr. Liebermann drafted an addendum dated May 13, 2013, based on his review of additional medical information. [R. 245-47.] He stated this new information did not change his assessment. [R. 246.] He concluded that "[f]rom a gastrointestinal standpoint, there are no new restrictions and limitations with the information provided. I should point out that from a gastrointestinal standpoint the claimant never had restrictions or limitations." [Id.]

### 6.   Dr. Rajesh Wadhwa

Dr. Wadhwa, Prudential's Medical Director, is a board-certified physician in occupational and internal medicine. [R. 2066.] At Prudential's request, he reviewed Ms. Cowern's medical records, as well as the assessments of the two multidisciplinary panels. [R. 2051-66, 2267.]

In a report dated July 30, 2013 [R. 2051-66], Dr. Wadhwa commented on Ms. Cowern's chronic abdominal pain, stating:

> The records fail to clarify clearly a pattern that would define the symptom with respect to time. For example there is no consistent description of the frequency of such abdominal pain, duration, severity documented objectively, or other descriptors such as radiation of pain to other parts of the body; or how it affects the nutritional or functional status of the claimant. . . . It appears from the notes that the abdominal pain is episodic and lasts for about 2 to 7 days. . . . There is no single unifying diagnosis that's able to define all her symptoms associated with chronic abdominal pain . . . .

[R. 2062.] He further stated that "[t]he reported pain symptoms by claimant are inconsistent and are not corroborated by any consistent sign, lab value or radiological finding suggestive of a discernible pathology within the abdomen, on the skin or in the joints." [R. 2066.] He noted that "[t]he records also show that the claimant is on long-term use of narcotics which have almost

certainly led to dependence which may be confounding the picture clinically and the records

show no evidence that that has been addressed." [R. 2063.] He further opined:

> Abdominal pain without any concrete sign of pain generator within the abdomen is a self reported symptom and use of narcotics is a matter of choice. As such records fail to show evidence that would support restricting work because of the symptom. None of the medical records above have consistently shown how the person is impaired from doing a sedentary job.

[Id.] He reiterated that "[t]he records are not clear as to how pain is impairing the claimant from

any particular activity." [R. 2065.] He concluded:

> The claimant suffers from a syndrome of poorly defined symptoms such as abdominal pain, joint pains and skin rashes none of which have been clearly documented in a consistent way. There has been no unifying diagnosis or etiology to explain her symptoms. Irrespective of the diagnosis, or lack of it, none of the records above have consistently recorded impairments that would require medically necessary restrictions from work.

[R. 2064.]

### 7.     Frances Grunden, MS, CRC (Prudential's Vocational Consultant)

As part of the second appeal, Prudential engaged Frances Grunden to prepare a

vocational report based on Ms. Cowern's medical records. Prudential forwarded to Ms. Grunden

records including the assessments of the second multidisciplinary panel. [R. 2073; see also R.

2267, 2073-79; Dkt. 50 at 11.] She concluded that "[t]he physical demands of claimant's

occupation appear within the capacity indicated" by the second multidisciplinary panel. [R.

2079.]

Additional facts relevant to the Court's analysis are addressed below where appropriate.

## III.    Discussion

### A.     Standard of Review

Under the Supreme Court's decision in Firestone Tire and Rubber Co. v. Bruch, "a denial

of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless

the benefit plan gives the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989). If the plan

confers such discretionary authority upon the plan administrator, the administrator's "use of that

discretion must be accorded deference." <u>Colby v. Union Sec. Ins. Co. & Mgmt. Co. for</u>

<u>Merrimack Anesthesia Associates Long Term Disability Plan</u>, 705 F.3d 58, 61 (1st Cir. 2013). In

that case, the standard for judicial review is abuse of discretion, which, "[i]n the ERISA context,

. . . is equivalent to the familiar arbitrary and capricious standard." <u>Id.</u>

 Here, the LTD Plan provides that "[t]he Prudential Insurance Company of America as

Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to

make factual findings, and to determine eligibility for benefits. The decision of the Claims

Administrator shall not be overturned unless arbitrary and capricious." [R. 38.] Ms. Cowern does

not dispute that, based on this language, the arbitrary and capricious standard of review applies

to Prudential's decision. [Dkt. 52 at 21.] The Court therefore applies that standard.

 Under the arbitrary and capricious standard, the Court must determine whether

Prudential's decision "is plausible in light of the record as a whole, or, put another way, whether

the decision is supported by substantial evidence in the record." <u>Leahy v. Raytheon Co.</u>, 315

F.3d 11, 17 (1st Cir. 2002) (citations omitted). The First Circuit has further explained:

> Even though this standard of review is deferential, we hasten to add that there is a
> sharp distinction between deferential review and no review at all. Applying a
> deferential standard of review does not mean that the plan administrator will prevail
> on the merits. In order to withstand scrutiny, the plan administrator's
> determinations must be reasoned and supported by substantial evidence. In short,
> they must be reasonable.

<u>Colby</u>, 705 F.3d at 62 (internal quotation marks and citations omitted).

 Additionally, the Court must weigh certain case-specific factors in determining whether

there has been an abuse of discretion. <u>See</u> <u>Firestone</u>, 489 U.S. at 103. "[W]hen judges review the

lawfulness of benefit denials, they will often take account of several different considerations . . . ." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008). ERISA actions "ask judges to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." Id.; see also Winkler v. Metro. Life Ins. Co., 170 F. App'x 167, 168 (2d Cir. 2006) (remanding based on a combination of factors, and finding no need to "reach the issue of whether any factor, on its own, would warrant vacatur"). "[A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." Glenn, 554 U.S. at 117. Thus, in determining whether Prudential's decision is supported by substantial evidence in the record, the Court applies what the Supreme Court has termed "the combination-of-factors method of review."[17] Id. at 118.

The parties have each moved for summary judgment. "Summary judgment in the ERISA context differs significantly from summary judgment in an ordinary civil case." Petrone v. Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson & Affiliated Companies, 935 F. Supp. 2d 278, 287 (D. Mass. 2013). The standard for summary judgment in an ordinary civil case "asks whether the factfinder's decision is inevitable even when all the evidence is marshaled in the objecting party's favor and all reasonable inferences therefrom are

---

[17] One factor often considered in ERISA cases is the existence of a conflict of interest for the claims administrator, where the claims administrator "not only evaluates claims but also underwrites the plan." Colby, 705 F.3d at 62; see also Glenn, 554 U.S. at 111; Leahy, 315 F.3d at 16. In this case, Prudential both underwrites the plan and evaluates claims. However, Judge Stearns previously denied Ms. Cowern's motion to take discovery on Prudential's conflict of interest and to expand the administrative record accordingly. [Dkt. 34; see supra pp. 7-8.] Judge Stearns denied the motion based on Ms. Cowern's failure to "identif[y] any specific procedural irregularities, unfairness or actual bias in the determination of her claims that would warrant the broad discovery she seeks . . . ." [Dkt. 34.] Based on this ruling (which the Court does not re-visit here), there is no evidence in the record that "the denial of benefits was improperly influenced by the administrator's conflict of interest." McGahey v. Harvard Univ. Flexible Benefits Plan, No. CIV.A. 08-10435-RGS, 2009 WL 799464, at *2 (D. Mass. Mar. 25, 2009). Thus, Prudential's possible conflict of interest is not addressed in this opinion.

shaped to fit that party's theory of the case." Leahy, 315 F.3d at 17. In the ERISA context, however, "in a very real sense the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Petrone, 935 F. Supp. 2d at 287 (quoting Leahy, 315 F.3d at 17-18). The First Circuit has explained:

> This respectful standard requires deference to the findings of the plan administrator, and, thus, even under Fed. R. Civ. P. 56, does not permit a district court independently to weigh the proof. Rather, the district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits.

Leahy, 315 F.3d at 18.

In this action, Ms. Cowern challenges Prudential's initial decision to terminate the LTD benefits and its denial of benefits on two subsequent, internal appeals. She contends that Prudential's denials were arbitrary and capricious for numerous reasons, which fall into two broad categories. First, she argues that Prudential abused its discretion by misinterpreting the language of the SRS limitation in the LTD Plan, and by erroneously applying the SRS limitation to her claim. Second, she argues that Prudential selectively relied on her medical records in various ways, resulting in an improper disregard for the medical evidence and opinions that support her claim for LTD benefits, and an undue emphasis on those aspects of the record that undermine her claim. The Court disagrees with Ms. Cowern's first contention but agrees with the second, and addresses these two claims in turn below.

**B.    Prudential Did Not Abuse Its Discretion in Applying the SRS Limitation to Ms. Cowern's Disability Claim**

Ms. Cowern argues that Prudential was arbitrary and capricious in its interpretation of the SRS limitation and its application of this limitation to her claim for LTD benefits. [Dkt. 52 at 22-

27; Dkt. 55 at 2-14; Dkt. 59 at 1-5.] Prudential responds that it "correctly applied the SRS limitation based on medical evidence from Plaintiff's own providers and Prudential's medical reviewers." [Dkt. 58 at 2.] Having carefully reviewed the record and considered the parties' arguments, the Court concludes that Prudential did not abuse its discretion in its interpretation and application of the SRS limitation.

As discussed above (supra Part II-A), the LTD Plan provides that "[d]isabilities due to a sickness or injury which, as determined by Prudential, are primarily based on ***self-reported symptoms*** have a limited pay period during your lifetime. . . . The limited pay period for self-reported symptoms . . . is 24 months during your lifetime." [R. 22 (emphasis in original).] "Self-reported symptoms" are defined in the plan as

> the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

[R. 23.] Further, Prudential's internal guidelines provide, in part, that "[a]n important distinction to be made when considering application of the SRS limit is that the ***manifestations*** of a condition should be the focus, rather than the ***diagnosis***." [R. 2293 (emphasis in original).]

Ms. Cowern argues that Prudential interpreted the SRS limitation in an inconsistent manner during the internal appeals process and in this litigation. [Dkt. 55 at 2-5.] She states that "[b]etween the internal appeal and this litigation, Prudential and its reviewing doctors have offered this Court four separate interpretations of the SRS Limitation." [Id. at 5.] She points to discrepancies in the wording of Prudential's various termination and denial letters, as well as in the language referencing the SRS limitation used by Prudential's reviewing doctors. For example, in its letter dated August 12, 2012, Prudential asserted that "the conditions for which

she is claiming benefits are self-reported and do not have a definitive diagnosis or objective findings to support a basis for impairments." [Id. at 3 (quoting R. 2242).] In its final denial letter of August 29, 2013, Prudential stated that "Ms. Cowern and her treating providers' reports of her inability to work in any occupation is based on Ms. Cowern's self-reports. Consequently, the application of the 24 month self report limitation remains appropriate." [Id. (quoting R. 2268-69).] Ms. Cowern asserts that Prudential's inconsistent interpretation of the SRS limitation was "unreasonable" under this Court's decision in Caola v. Delta Air Lines, Inc., which states that one consideration in determining whether an interpretation of a plan is reasonable is "whether the provision at issue has been interpreted and applied consistently." 59 F. Supp. 2d 166, 170 (D. Mass. 1999).

Prudential responds that "Plaintiff's argument fails because she focuses on form over substance. Specifically, it is undisputed that, at every phase, Prudential denied Plaintiff's claim for benefits because it found that her symptoms were primarily self-reported." [Dkt. 58 at 2.] The Court has studied the differences in wording found in the various denial letters, medical reviews, and in this litigation, and concludes that while these discrepancies may be more than immaterial semantic distinctions, they do not rise to the level of an abuse of discretion.

Ms. Cowern additionally argues that Prudential and its reviewing physicians unduly focused on the lack of a definitive diagnosis, contrary to the plain language of the LTD Plan and Prudential's internal guidelines. [Dkt. 55 at 5-14.] See Caola, 59 F. Supp. at 170 ("In determining whether an interpretation of a plan is reasonable, courts have given due consideration to a number of factors," including "whether the interpretation is clearly contrary to the clear language of the plan . . . .") (internal quotation marks and citations omitted); see also Al-Abbas v. Metro. Life Ins. Co., 52 F. Supp. 3d 288, 297 (D. Mass. 2014)) ("[A]dministrators

cannot deny benefits simply on the basis that the claimant cannot be definitively diagnosed."); Langone v. Se. Metal Fabricators, Inc., 638 F. Supp. 2d 89, 93 (D. Mass. 2009) ("Where the trustees of a plan . . . interpret the plan in a manner inconsistent with its plain words, . . . their actions may well be found to be arbitrary and capricious.") (internal quotation marks and citation omitted).

The Court acknowledges that certain statements by Prudential and its reviewing doctors, taken in isolation, could suggest an undue emphasis on the lack of a definitive diagnosis. For example, Prudential's final denial letter contains the following sentence: "The medical records and reports do not document a unifying diagnosis or etiology to explain symptoms." [R. 2268.] In his second assessment, Dr. Day stated that "[t]his is a complicated medical history without a unifying diagnosis . . . ." [R. 2111.] In her report from the second multidisciplinary panel review, Dr. Antonelli noted that Ms. Cowern's primary care physician "believes that she has these symptoms but no clear diagnosis could be made." [R. 373.] Reading the record as a whole and applying a deferential standard of review, however, the Court cannot conclude that Prudential improperly focused on the absence of a clear diagnosis. Neither Prudential nor any of its reviewing doctors ever suggested that the lack of a diagnosis was the sole or even the primary reason for denying LTD benefits. Moreover, the Court will not hold that Prudential is prohibited from considering the lack of a diagnosis or commenting on the fact that there is no definitive diagnosis, particularly where that is an accurate assessment of Ms. Cowern's medical records.

For the reasons explained in the next section (infra Part III-C), however, the Court remands this case to Prudential on the basis of other errors amounting to an abuse of discretion. Thus, Prudential will have occasion again to interpret the SRS limitation and to determine whether it applies to Ms. Cowern's claim. On remand, Prudential is cautioned to ensure that it

interprets the SRS limitation and determines its applicability consistently with the language of the LTD Plan and Prudential's internal guidelines.

**C.  Prudential's Selective Focus on Evidence Undermining Ms. Cowern's Claim for LTD Benefits, While Failing to Address Contrary Evidence, Was Arbitrary and Capricious**

**1.  Prudential's Reliance on Surveillance Footage**

As discussed above (supra Part II-C), Prudential engaged FactualPhoto to conduct covert surveillance of Ms. Cowern in early 2010. FactualPhoto conducted multiple, consecutive days of surveillance on two separate occasions, totaling nine days—first, from January 6-9, 2010, and then, from March 11-15, 2010. [Dkt. 52 at 13.] These nine days of surveillance yielded a total of less than seven minutes of footage, much of which simply showed the outside of Ms. Cowern's house. [Dkt. 55 at 16.] On five of the nine days, Ms. Cowern was never observed leaving her house. On the four days when she left her house, the surveillance footage showed her getting in and out of a car, either as a passenger or a driver, and walking short distances between her car and her destination.

FactualPhoto noted in its report that overall, Ms. Cowern "was observed to be minimally active." [R. 1887.] On January 6, 2010, she drove to a Dunkin Donuts, walked a short distance through the parking lot and made a purchase, returned to her car, and drove to a medical office where she spent an hour and a half. [R. 1898, 1902-03.] She returned home approximately two hours after leaving. [Id.] On March 12, 2010, she was a passenger in a car that drove to a bank and an auto services center, before returning home 13 minutes after leaving. [R. 1887, 1893.] On March 13, 2010, she drove to a Dunkin Donuts, placed an order at a drive-thru window, and returned home 11 minutes after leaving. [R. 1887, 1894.] On March 14, 2010, she was observed driving away from her house but was subsequently lost by the surveillance team. [R. 1895.]

When surveillance resumed later the same day, her car was back in the driveway. [Id.]

FactualPhoto's notes for January 7-9, 2010, March 11, 2010, and March 15, 2010, indicate that

Ms. Cowern was not observed leaving the house on those days. [R. 1892, 1895, 1904.]

Prudential acknowledges that it "did rely, in part, on the surveillance during the review of

[Ms. Cowern's] claim . . . ." [Dkt. 58 at 4-5.] Drs. Antonelli, Day, Vuppalanchi, and Liebermann

each commented on the surveillance.[18] In its termination letter of September 15, 2011, Prudential

stated that "[t]he video surveillance obtained, documented Mrs. Cowern driving and ambulating

without difficulty." [R. 2237.] Ms. Cowern contends that Prudential unreasonably relied on the

footage "as the surveillance findings neither (1) contradicted Ms. Cowern's self-reported

symptoms; nor (2) revealed that she is able to perform the duties of any gainful occupation."

[Dkt. 55 at 16.] Prudential defends its reliance on the footage, citing the First Circuit's decision

in Cusson v. Liberty Life Assurance Company of Boston, 592 F.3d 215 (1st Cir. 2010), which

held that the defendant in that case was entitled to consider surveillance footage. [Dkt. 50 at 21.]

Cusson was different from this case, however, in the significant respect that "[m]any of

the activities that Cusson was observed doing were activities that she specifically reported being

unable to do, such as bending at the waist and lifting objects heavier than ten pounds." 592 F.3d

at 225. The First Circuit further explained that

> although the limited amount of time she was seen outside her home is a factor that
> weighs in Cusson's favor, Liberty was certainly entitled to take notice of the fact
> that the video shows Cusson doing particular activities that she claimed she could
> not do. . . . The surveillance also shows Cusson bending, kneeling, picking up large

---

[18] Dr. Antonelli stated that the surveillance footage "revealed that [Ms. Cowern] was highly functional.
She was able to drive a car. She was able to walk. She was able to go into stores at least at Dunkin'
Donuts." [R. 810.] Dr. Day noted that that the footage showed Ms. Cowern "driving and ambulating
without difficulty." [R. 2110.] Dr. Vuppalanchi stated that the footage "show[ed] Ms. Cowern walking to
her car with hand bag and driving her car with no restrictions or limitations." [R. 824.] He concluded that
"[o]verall, I do not feel that she has any restrictions and/or limitations based on her surveillance imaging
videos." [Id.] Dr. Liebermann found that "[n]o significant information was provided by the investigation
agent beyond him seeing the claimant get in and out of her automobile." [R. 382.]

objects such as a bag of cat litter, and pushing a loaded cart, despite the fact that the Functional Capacities Form completed by [Cusson's rheumatologist] . . . indicated that Cusson was physically unable to perform these activities.

Id. at 229.

Unlike in Cusson, Ms. Cowern never claimed that she was unable to do the activities that she was seen doing in the surveillance—namely, leaving her house, getting in and out of a car, driving or sitting in the car as a passenger for short drives, and walking short distances to and from the car. See Maher v. Mass. Gen. Hosp. Long Term Disability Plan, 665 F.3d 289, 294 (1st Cir. 2011) ("[M]ost of the surveillance, far from contradicting [the claimant's] disability, seems to confirm her lifestyle as generally housebound with occasional, limited activity. . . . [T]his is far from a situation in which a video conclusively disproves the disability claim."). The footage in this case, which the Court has reviewed in its entirety, does nothing to address the ultimate questions before Prudential—whether Ms. Cowern's claimed periods of extreme pain and other abdominal symptoms actually occur, and if so, whether these episodes inhibit her from performing the material and substantial duties of her sedentary occupation. Thus, Prudential improperly relied on the footage and was arbitrary and capricious in doing so.

## 2.  Prudential's Reliance on Selected Portions of Dr. Liebermann's Opinion

Ms. Cowern next claims that "[i]nstead of engaging with the evidence supportive of Ms. Cowern's disability . . . Prudential cherry-picked those aspects of the reports it believed supported the decision to terminate coverage and ignored the rest. . . . Prudential selectively engaged with the evidence favoring its desired outcome." [Dkt. 55 at 15.] She argues, and the Court agrees, that Prudential's treatment of Dr. Liebermann's opinion was especially misleading.

As discussed below, Dr. Liebermann's analysis contained some statements that supported Ms. Cowern's claim for LTD benefits, and other statements that undercut her claim. [R. 245-47,

377-86.] "Of course, the existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary, but the administrator cannot simply ignore contrary evidence, or engage with only that evidence which supports his conclusion." Petrone, 935 F. Supp. 2d at 293 (internal quotation marks and citation omitted).

In its final denial letter, dated August 29, 2013, Prudential cited and quoted Dr. Liebermann's opinion in support of its conclusion that Ms. Cowern is not disabled. [R. 2266.] The final denial letter characterized Dr. Liebermann's report as concluding that "the records did not support a diagnosis of IBD or Crohn's disease," and that "the medical records do not support any restrictions and limitations from a gastrointestinal perspective." [Id.; see also R. 245-47, 377-86.] Prudential's letter entirely ignored any statements by Dr. Liebermann that would tend to support Ms. Cowern's claim for LTD benefits. For example, in his report from the second multidisciplinary panel review dated March 8, 2013, Dr. Liebermann wrote: "I personally doubt the claimant can return to work on a fulltime basis due to the intensity of her symptoms and also the use of substantial amount of narcotics that she is by now habituated to." [R. 384.] He also stated: "In all likelihood she has a pain predominant form of the irritable bowel syndrome and narcotic bowel syndrome. Her record is replete with information that would tend to favor this type of diagnosis." [R. 383-84.] He further stated that he and Dr. Antonelli

> reached a consensus of medical opinion regarding the case of Ms. Julie Cowern. We both believe that the claimant has a definite functional disorder of the gastrointestinal tract compounded by the protracted use[] of narcotic analgesic medications resulting in the so-called narcotic bowel syndrome which explains the periodic exacerbations of her abdominal pain.

[R. 382.]

None of these statements is acknowledged in any way in Prudential's final denial letter of August 29, 2013. [R. 2264-69.] It was improper to ignore them and rely selectively on only those

portions of Dr. Liebermann's opinion that supported a determination that Ms. Cowern was not entitled to continue receiving LTD benefits. E.g., Winkler, 170 F. App'x at 168 ("An administrator may, in exercising its discretion, weigh competing evidence, but it may not . . . cherry-pick the evidence it prefers while ignoring significant evidence to the contrary."). Prudential's failure to address Dr. Liebermann's statements supporting Ms. Cowern's claim was arbitrary and capricious.

### 3. Prudential's Reliance on Ms. Grunden's Vocational Opinion

Ms. Cowern further argues that "Ms. Grunden's vocational review is substantively flawed as it found its basis on an incomplete record." [Dkt. 55 at 19.] From the administrative record alone, it is not entirely clear to the Court which files Prudential provided to Ms. Grunden in connection with her vocational assessment. However, Prudential seems not to dispute that Ms. Grunden's vocational opinion was based on only "external medical reviews"—i.e., those reviews done by physicians employed or retained by Prudential. [Dkt. 58 at 5.] Based on the ambiguity in the record and Prudential's apparent acknowledgment that only "external medical reviews" were made available to Ms. Grunden, the Court proceeds on that understanding of which records Prudential provided to her.[19]

Ms. Grunden concluded from the partial record provided to her that "[t]he physical demands of claimant's occupation appear within the capacity indicated" by the second multidisciplinary panel. [R. 2079.] Further, in its final appeal denial letter of August 29, 2013, Prudential relied in part on Ms. Grunden's conclusion, stating that "[t]he vocational consultant

---

[19] The Court notes, however, that it would have remanded this case even if Prudential had provided Ms. Cowern's complete medical records to Ms. Grunden, based on the other errors addressed in this opinion.

concluded the restrictions and limitations outlined above are consistent with the physical requirements of Ms. Cowern's occupation." [R. 2267.]

The Court finds that Prudential abused its discretion by providing to Ms. Grunden an incomplete record, and by then relying on her opinion, which was based on the incomplete record. An administrator's failure "to provide its independent vocational and medical experts with all of the relevant evidence" is evidence of arbitrary and capricious decision-making on the part of the administrator. Glenn, 554 U.S. at 118; see also Smith v. Cont'l Cas. Co., 450 F.3d 253, 261 (6th Cir. 2006) ("[T]here is clear evidence that there are discrepancies in the overall number of medical records that were provided to [the administrator] for review, and the number that were in fact reviewed by [the independent medical reviewer]. Without knowing why there are these discrepancies, it is impossible to say that [the administrator] did not artificially alter the record for [the independent medical reviewer's] review. If [the administrator] did 'hand pick' the records, then [the claimant's] right to a 'full and fair review' of her disability denial was abridged."). Absent any explanation for Prudential's failure to provide portions of the record to Ms. Grunden, the Court cannot rule out the possibility that Prudential "hand picked" the records sent to Ms. Grunden in an effort to lead her to conclude that Ms. Cowern was able to meet the physical demands of her occupation.

#### 4.      Prudential's Rejection of Mr. Parker's Vocational Reports

Ms. Cowern additionally contends that Prudential abused its discretion by rejecting Mr. Parker's vocational reports, which (unlike Ms. Grunden's review) were based on a review of "Ms. Cowern's entire medical records." [Dkt. 55 at 19.] In its first appeal denial letter dated August 15, 2012, Prudential's stated the following reasons for rejecting Mr. Parker's conclusions:

> We have also reviewed the vocational report you provided that was authored by James Parker. This report makes a vocational assessment based on restrictions and limitations that we have determined to not be supported by medical data. Additionally, this report is not relevant to the self-reported conditions benefit limitation that pertains to Ms. Cowern's claim.

[R. 2255.] In its second appeal denial letter dated August 29, 2013, Prudential reaffirmed this

position in nearly identical terms:

> As we explained in our previous letter, Mr. Parker's assessment and conclusions are based on restrictions and limitations we have determined are not supported by the medical data. Additionally, this report is not relevant to the self-reported conditions benefit limitation that pertains to Ms. Cowern's claim.

[R. 2268.]

Ms. Cowern argues that Prudential's dismissal of Mr. Parker's vocational reports as

irrelevant, but its acceptance of Ms. Grunden's vocational report, demonstrates "selectivity [that]

is emblematic of Prudential's review of Ms. Cowern's claim." [Dkt. 55 at 19 n.5.] To the extent

that she claims that Prudential must credit the opinion of her vocational consultant because it

credited the opinion of its own consultant, the Court disagrees. See Vlass v. Raytheon

Employees Disability Trust, 244 F.3d 27, 32 (1st Cir. 2001) ("It is the responsibility of the

Administrator to weigh conflicting evidence."); see also Morales-Alejandro v. Med. Card Sys.,

Inc., 486 F.3d 693, 700 (1st Cir. 2007) ("[A] plan administrator is not obligated to accept or even

to give particular weight to the opinion of a claimant's treating physician.").

However, under ERISA, employee benefit plans that deny disability benefits must "set[ ]

forth the specific reasons for such denial, written in a manner calculated to be understood by the

participant." 29 U.S.C. § 1133. This encompasses a requirement that Prudential explain why it

chose to discredit relevant evidence. E.g., Love v. Nat'l City Corp. Welfare Benefits Plan, 574

F.3d 392, 396 (7th Cir. 2009) (finding that the defendant did not sufficiently explain the reasons

for its denial of disability benefits as required by 29 U.S.C. § 1133, where "neither the initial

termination letter nor the subsequent letter denying [the claimant's] appeal explained <u>why</u> the reviewer chose to discredit the evaluations and conclusions of [the claimant's] treating physicians") (emphasis in original).

Prudential has not adequately explained why it rejected Mr. Parker's conclusions. In both appeal denial letters, Prudential simply asserts, without further explanation, that his "assessment and conclusions . . . are not supported by the medical data," and that they are "not relevant" to the SRS limitation. Without more, this conclusory basis for rejecting Mr. Parker's opinions does not satisfy Prudential's obligation under 29 U.S.C. § 1133 to give "specific reasons" for its denial. The Court determines that Prudential's rejection of Mr. Parker's vocational reports, without providing sufficient reasons for doing so, was arbitrary and capricious.[20]

---

[20] Ms. Cowern argues that Prudential similarly abused its discretion by rejecting the Functional Capacity Evaluation conducted by Ms. Breeze in April 2013. [Dkt. 52 at 29-30.] The Court disagrees. Unlike Prudential's insufficient explanation as to why it rejected Mr. Parker's vocational reports, both Prudential and its reviewing physicians provided an adequate basis for discrediting Ms. Breeze's evaluation.

In its final denial letter of August 29, 2013, Prudential stated:

> Dr. Wadhwa finds the FCE has poor validity and reliability because it includes no reference to validate testing except in the case of grip strength test. The clinical information at the time of the FCE does not record impairments if any; and is based on subjective symptoms reported by the claimant.

[R. 2268.] Prudential further noted that the impairments identified in Ms. Breeze's evaluation were "not corroborated by normal neurological findings by other providers around the same time." [<u>Id.</u>] Similarly, Dr. Antonelli reviewed the evaluation and concluded:

> This FCE report documents primarily restrictions in her activities that appear to be self-reported symptoms and limitations without clear objective measurements of impairments, except her grip strength. The claimant is described as having impairments in ROM [range of motion] of her lower extremities that are not clearly described, including which joints are impaired. . . . It is not clear why her flexibility is impaired due to abdominal pain.

[R. 227-28.] Thus, both Prudential and its reviewing physicians provided specific and adequate reasons for choosing to discredit the functional capacity evaluation. Given the deferential standard of review that applies in this case, the Court will not substitute its own judgment as to whether the Functional Capacity Evaluation warranted greater weight than Prudential accorded it. The Court concludes that Prudential did not abuse its discretion in this regard.

### 5.      Prudential's Failure to Address Ms. Cowern's SSDI Benefits

Ms. Cowern also argues that Prudential's failure to consider the fact that she was

awarded Social Security Disability Income ("SSDI") benefits was arbitrary and capricious. [Dkt.

52 at 32.] The sole mentions of the SSDI award in the administrative record appear in Mr.

Parker's second vocational assessment dated August 9, 2013, in which he noted:

- "Ms. Cowern has been determined totally disabled by the Social Security
  Administration and is receiving SSDI benefits." [R. 108.]

- "Subsequent to this consultant's first vocational report, Ms. Cowern was found to
  be totally disabled by the Social Security Administration (SSA). This consultant
  serves as a vocational expert with the SSA. In this capacity, this consultant has
  participated in thousands of Social Security hearings. In order to be determined
  eligible for SSDI benefits, one must be considered totally disabled from all work
  at the <u>sedentary</u> level or above. This would apply to work performed at the
  <u>skilled</u>, <u>semi-skilled</u>, or <u>unskilled</u> level. This is indicative of an objective agency's
  assessment of Ms. Cowern's inability to work. Records indicate in an SSA
  decision, Ms. Cowern was awarded benefits beginning in August of 2010." [R.
  115 (emphasis in original).]

In the same assessment, Mr. Parker also stated that he reviewed, among other documents, a

"Notice of Award" from the Social Security Administration dated September 15, 2012 [R. 109],

but the notice itself does not appear in the record.

While the decision of the Social Security Administration to award disability benefits is

not binding on a claims administrator, it is relevant evidence of disability. See <u>Petrone</u>, 935 F.

Supp. 2d at 295 ("[T]he reasoning of the Social Security Administration's determination cannot

simply be ignored. The ALJ's decision is further record evidence of [the claimant's] disability

and a reasonable determination must address the substance of the decision . . . .").

Prudential argues in this litigation that it "could not have considered Plaintiff's SSDI

award at the time of the second denial because the formal SSDI award letter was not (and is not)

part of the administrative record." [Dkt. 54 at 19.] The Court disagrees that Prudential could not

have considered Ms. Cowern's SSDI award. Although the award letter itself is not part of the administrative record, the fact that Ms. Cowern was awarded benefits is. Prudential was not entitled to ignore the SSDI award simply because the formal SSDI award letter was not before it. Since Prudential apparently takes the position that the formal letter was required to consider the SSDI award, Prudential should have informed Ms. Cowern of the deficiency and provided her with an opportunity to furnish the letter, along with any other information needed to evaluate the Social Security Administration's opposing disability determination—such as the medical record before the Social Security Administration and the administrative law judge's opinion, if one was written in Ms. Cowern's case. See 29 C.F.R. § 2560.503-1(g)(1)(iii) (requiring the plan administrator to include, in a denial notification, "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary"). Prudential's failure to acknowledge or address the SSDI award in its final decision on the basis that the formal award letter does not appear in the record, together with its failure to provide Ms. Cowern with an opportunity to provide the letter, was arbitrary and capricious.

**IV.     Conclusion**

        The Court concludes that, as in Petrone, the evidence in favor of Ms. Cowern's disability is "not so overwhelming as to compel summary judgment" in her favor. 935 F. Supp. 2d at 296. However, there are clear deficiencies in the integrity of Prudential's decision-making process, such that Prudential also must be denied summary judgment. See id. at 297 (citing Buffonge v. Prudential Ins. Co. of America, 426 F.3d 20, 31 (1st Cir. 2005)).

For the reasons set forth in this opinion, both motions for summary judgment [Dkt. Nos. 49, 51] are DENIED, and the case is REMANDED to Prudential for further proceedings consistent with this opinion.

**SO ORDERED.**

Dated: September 11, 2015                                     /s/ Allison D. Burroughs
                                                             ALLISON D. BURROUGHS
                                                             U.S. DISTRICT JUDGE